In the matter of CARL RAISCH, a solicitor of the court of chancery of New Jersey.

[Submitted December 6th, 1912. Decided February, 1914.]

1. The court of chancery of New Jersey has power to try a solicitor of the court for malpractice and misbehavior in his office as solicitor, and, if he be found guilty, has power to debar such convicted solicitor from practice, and prohibit him from exercising the functions, &c., of a solicitor of the court.

2. The office of a solicitor in chancery is distinct from the office of an attorney-at-law. Attorneys-at-law and solicitors in chancery are officers of the courts respectively in which they serve, and are not officers of the state, and they are not removable by impeachment or by the action of the governor who in form appoints them. They are removable by the judicial action of the courts whose officers they are.

3. Historical origin in England of solicitors, who are now the representatives or attorneys of parties litigant in courts of equity, considered.

4. History of· the appointment of solicitors in New Jersey set forth. The colonial governors, under their commissions from the king, having the power to appoint "necessary officers * * * for the better administration of justice and putting the laws in execution," commissioned attorneys-at-law, and then, as chancellors, recognized these attorneys as

solicitors, when they presented themselves as such in the somewhat inactive court of chancery of the Province of New Jersey. At a later date, not later than shortly after the adoption of the constitution of 1776, the governor, being also the chancellor, upon his own motion, included the appointment of a solicitor in chancery in the license or commission which he issued appointing a person, upon the recommendation of the supreme court, as an attorney-at-law, following, in substance, the English custom of admitting as solicitors, as a matter of course, all licensed attorneys, without examination.

5. The reasons considered why, when the constitution of 1844 was framed and the governor ceased to be the chancellor, the appointment of attorneys, solicitors and proctors was not vested in the courts, as was done in New York in 1777, when the same constitutional change was made in the courts of that state.

6. The action of the supreme court in striking an attorney from the rolls may be correctly regarded as a judgment that, under the condition contained in his license that his appointment continued "during his good behavior," the license or commission has expired by its own limitation.

7. Judge Paterson's Practice act and his act prescribing certain oaths (*Pat. pp. 355, 376*), remaining substantially unchanged to-day (*3 Comp. Stat. p. 4054 §§ 5, 16, 17; Id. p. 3769 § 6*), discussed in relation to the independent existence of the two offices of attorney-at-law and solicitor in chancery, and the control each court has over its own officers.

8. If the court of chancery of New Jersey cannot discipline solicitors, its own officers, there is no way provided by law by which that court can communicate a case of malpractice to the supreme court or make it the duty of that court to act in the premises.

9. The supreme court in suspending attorneys does not necessarily derive its authority from Mr. Paterson's law; in all cases of disciplining an attorney by suspension or expulsion it exercises an inherent power— the Paterson law in regard to that matter being declaratory.

10. A master in chancery is removable only by the court of chancery.

11. An inherent power of the court of chancery is not lost by mere disuse during a period, however long, during which there was practically no occasion for its exercise.

12. Some reported New Jersey decisions in malpractice cases cited and discussed.

13. Nothing but plain provisions of the constitution or of constitutional legislation should be deemed to have deprived the court of chancery of New Jersey of the power of disciplining its own solicitors, who practice "under the direction" of that court, when they are guilty of malpractice as solicitors, or to leave the court of chancery dependent upon the supreme court for the discharge of this important function relating to its own machinery and its own internal affairs.

14. Some ancient forms of commissions or "licenses" issued to legal practitioners described, as illustrations of the views expressed in the opinion.

On order to show cause why the respondent, Carl Raisch, should not be adjudged guilty of malpractice as solicitor of the court of chancery, and thereupon be put out of the roll of solicitors of this court, and be suspended from practicing as solicitor of this court, or until the chancellor shall otherwise order, or be otherwise disciplined and punished for his misconduct as may be deemed equitable and just. Heard on specific charges of malpractice, defendant's answer to same and proofs taken in open court.

*Mr. John M. Enright,* prosecutor (appointed by the court).

*Mr. Charles H. Burtis,* for the defendant.

STEVENSON, V. C.

The malpractice charged and proved against Mr. Raisch relates solely to his conduct as an officer of the court of chancery, and consists of fraud and imposition upon the court in the conduct of a suit for divorce. The proof is convincing. The respondent did not offer any testimony, and did not go upon the witness-stand to meet the force of the direct proofs of malpractice or to offer any explanation. It does not seem to be necessary to set forth in very great detail the evidence of the malpractice of which it is my duty under the evidence to find the respondent guilty. The respondent, as a solicitor of this court, on February 20th, 1911, filed a petition on behalf of May Mattner against her husband, Otto Mattner, praying for an absolute divorce on the ground of adultery. The usual proceedings seem to have been then taken to bring in the defendant by publication, and the proofs filed show that notice of the suit was actually received by the defendant through the mail while he was residing in Baltimore, Maryland, and that his time to file an answer expired on the 13th day of June, 1911. The suit seems to have slumbered until February 21st, 1912, when an appearance for the defendant which, it is perfectly apparent, is in the handwriting of the respondent, Mr. Raisch, was filed in the name of Mr. James D. Manning, a solicitor of this court, whose

condition of health may account for the fact that he was not called as a witness in this proceeding.

On March 18th, 1912, an answer was filed purporting to be signed by James D. Manning, as solicitor of defendant, of which answer both the body and the signature, it is likewise perfectly apparent, are in the handwriting of Mr. Raisch. The respondent admitted to a witness, who testified in this cause, that he, Mr. Raisch, had signed the answer in Mr. Manning's name, but claimed that he had been permitted to do so by Mr. Manning. The answer on its face is a sham, setting forth no defence, while admitting the marriage and the residence of the petitioner in the State of New Jersey, and it does not exhibit the signature of Mr. Mattner, the defendant, as required by the statute. The proofs do not show that the defendant, Mattner, ever employed Mr. Manning or any solicitor to defend the suit, and indicate that he did not know that this answer was filed. Mr. Raisch stated to the witness above referred to that he had procured the answer to be filed because he could not pay the fee for getting an order of reference. The fraudulent plan of the respondent seems to have been to procure an order of reference to a vice-chancellor and bring on the cause for hearing upon notice to Mr. Manning, as solicitor of the defendant, who at the time was perhaps in such a condition of health as to make him irresponsible for his actions. This, of course, would have insured an *ex parte* hearing on an answer raising no issue, and thus all the expenses of a reference to a special master, which Mr. Raisch had neglected to have made in June, 1911, would have been saved.

In my opinion, the conduct of the respondent constitutes "such intentional fraud upon the court * * * as shows evidence of moral turpitude" (*In re Cahill, 66 N. J. Law 527, 531*), and makes the inference unavoidable that he is not a fit person to be permitted to exercise the functions of a solicitor of the court of chancery.

Counsel for the respondent made no objection to the exercise of jurisdiction by the court, to remove or suspend the defendant in case he should be found guilty of the malpractice charged against him. The questions of fact upon the evidence, and an appeal for mercy, in case the respondent should be found guilty

of any malpractice, constituted the only subject-matter of the argument on his behalf.

In view, however, of some variance or uncertainty of opinion in the minds of judges and members of the bar, as to the correct course of procedure to be taken, in order to have a solicitor of the court of chancery removed or suspended for malpractice, it has been thought that a statement in support of the exercise of such jurisdiction in this case is advisable. Such a statement seems all the more appropriate because of the anomalies and uncertainties which are encountered when the effort is made to ascertain the exact status of attorneys-at-law and solicitors in chancery of New Jersey, in respect of the historical origin and legal basis of their offices. For generations many things appertaining to these officers, who, in the colonial legislation, are sometimes called attorneys-at-law, and sometimes "practitioners of the law" (see ordinance of 1723, by Governor Burnett, regulating and establishing fees, page 10), have been involved in the obscurity of ancient customs, the exact origin of which is often hard definitely to ascertain. What comes down from the past and fits into the requirements of the present is often accepted without inquiry in regard to its historical or legal basis, and without consideration or even recognition of characteristics which theoretically are anomalous or even absurd.

Probably the most interesting and curious feature of our present New Jersey method of appointing attorneys-at-law and solicitors in chancery, consists in the fact that these officers of the courts are appointed not by the courts but by the governor of the state, who is now the political head of the state, and has no connection with the actual administration of justice in the courts. It is true the governor appoints the judges by and with the advice and consent of the senate, but judges are officers of the state, and the exercise of such a power does not even suggest the propriety of permitting the governor alone to appoint and commission the officers of the courts whose judges he so appoints. So far as I am aware, this anomaly is not found in any other state of the Union, although perhaps some modification of this statement may be necessary. Certain it is that in England and in our federal courts, and in the most of the courts of the states,

the practice has been settled for years of having the courts appoint as well as remove these officers. It is beyond all dispute that attorneys-at-law and solicitors in chancery are not officers of the state; they are not removable by impeachment. They are officers of the courts and are removable by the courts. By what courts and through what judicial process these officers are removable in New Jersey is the subject of our present consideration.

No one has ever suggested that after the governor of the state has commissioned or "licensed" an attorney-at-law and solicitor in chancery, he now has any power to revoke the appointment and cancel the commission, although a colonial governor may possibly have assumed to exercise such a power. The lawyer is licensed only "during his good behavior," but the governor, so far as I know, has never assumed the power of determining that the license of a lawyer by its own terms had expired; this has been regarded as a judicial function to be exercised by a court.

1. The office of solicitor in chancery is a distinct and separate office from that of attorney-at-law. The fact that these two offices formerly often were held and now uniformly are held by a single person, is a mere accidental circumstance growing out of the conditions under which legal business in the courts has been attended to during the last century or two. During a long period it was the practice of the English court of chancery to admit as solicitors all applicants who had been admitted as attorneys-at-law without further examination, but a separate examination was held under the direction of the court of chancery for applicants for appointment as solicitors who did not hold attorneys' licenses. All persons who were deemed qualified for appointment by the court of chancery as solicitors, evidenced by the presentation of their credentials as attorneys-at-law, or by the result of an examination held under the direction of the court of chancery, were appointed and sworn in by the court of chancery as solicitors, and thereupon they signed a roll which was kept by that court. For malfeasance the English court of chancery always exercised the power of striking the name of the convicted solicitor from its rolls. *2 Dan. Ch. Pl. & Pr. (6th Am. ed.) ch. 43 p. 1840 et seq.; 1 Sm. Ch. Pr. ch. 26 pp. 676 et seq.*

The appointment and the suspension or expulsion of solicitors were effected by the action of the court of chancery of England, and this power was regulated by English statutes. There is no evidence that 1 have been able to discover that any solicitor of the court of chancery of England was ever appointed by letters patent from the king.

From the history of the appointment of attorneys-at-law and solicitors in chancery in England and in this country, the fact appears to be indisputable that the offices are as distinct as are the offices of a judge of a common law court and a judge of a court of equity under the ancient English and present New Jersey system.

It was a long time after attorneys were recognized in the law courts, and their appointment was regulated by statute, before there were any solicitors in chancery, and when solicitors first appeared, they "had no strictly defined position." *Christian's Short History of Solicitors, ch. 3.* Originally, "the Six Clerks from the nature of their office were the attorneys of the parties charged with their business." *Ex parte The Six Clerks, 3 Ves. Jr. 599.* When the business of the court greatly increased, the sworn clerks, or under clerks, were brought in as the assistants of the Six Clerks, and they also became the attorneys of the parties litigant in the court. *Twort v. Dayrell, 13 Ves. Jr. 195; Braithw. Six Clerks Chan. 10.* During this period when the Six Clerks and the sworn clerks, or under clerks, were the representatives or attorneys of the parties litigant, under the pressure of business, a class of agents, not necessarily attorneys-at-law, found employment to expedite or "solicit" causes, sometimes by operations of more than doubtful legality. An interesting account of this class of hangers-on and their final acceptance by the court of chancery as officers of the court, will be found in Mr. Christian's book above cited. In time, as stated by Mr. Daniel (*supra*), the business of the court of chancery became so great that the sworn clerks were confined "to the performance of a certain portion of the business in every suit, and the remainder was performed by solicitors duly admitted as officers of the court."

In the great majority of the states of the Union, where law and equity are both administered by the same court, it has

naturally come about that the two offices of attorney-at-law and solicitor in chancery have practically been consolidated. It is interesting to note that in the State of Delaware, where equity is administered by a chancellor, in the case *In re Hoffecker, 60 Atl. Rep. 981,* the court of chancery held that the position of the respondent, who in the proceeding was charged with malpractice, "as attorney-at-law, was absolutely independent of his position as solicitor in chancery," and that the rule to be entered could "only affect his position as solicitor." The respondent solicitor being convicted of malpractice was stricken from the rolls of the court of chancery.

2. The origin of the present method by which in New Jersey persons are inducted into the office of attorney-at-law, and the other office of solicitor in chancery, is to a considerable extent shrouded in the mist of antiquity. A great deal of information on this subject of interest to the New Jersey lawyer has only recently been made accessible in the elaborate and illuminating opinion of Mr. Justice Garrison in the *Branch Case (In re Branch, 70 N. J. Law 537),* and in the brief of counsel submitted to the court and printed with the opinion in that case.

A brief discussion of some points pertaining to the history of attorneys and solicitors in New Jersey will be attempted herein mainly for the purpose of emphasizing the proposition that historically as well as legally and logically, the office of a solicitor in chancery is absolutely distinct from the corresponding office of attorney in the law courts.

It seems quite plain that the ancient custom of having attorneys-at-law licensed or commissioned by the colonial governors, was supported by the language of the commission to Lord Cornbury, which authorized and empowered him "to constitute and appoint judges and, in cases requisite, commissioners of oyer and terminer, justices of the peace and *other necessary officers* and magistrates in our province, for the better administration of justice, and putting the laws in execution." *Field's Prov. C. 250.*

In the case of Henry W. Cooper (*22 N. Y. 67*), Prof. Dwight in his learned and elaborate brief (at *p. 79*) quotes this same language which was found in the royal commission to Lord

Cornbury as the colonial governor of New York, and states that the New York governor "doubtless derives his power" to appoint attorneys-at-law from this clause. I can see no reason to doubt the truth of this statement, although the supreme court of New York, in an early case, stated that before the revolution the power of appointing attorneys was exercised by the governor, and that such power was recognized by the courts, but whether such power was exercised "justifiably or not," the court deemed it "immaterial to inquire." *People* v. *Justices of Delaware (1799), 1 Johns. Cas. 181, 182.*

In New Jersey Lord Cornbury proceeded by ordinance to establish courts, but he conferred upon those courts no power to appoint attorneys-at-law; he reserved this prerogative to himself. It may be noted in this connection that for every commission issued to an attorney the governor received a fee of twenty shillings. Governor Burnett's ordinance of 1723 above cited.

It is unnecessary to examine the ancient practice centuries ago, when the common law courts of England recognized no attorneys, but required the parties to appear from day to day in person, according to which practice the king by letters patent authorized certain individuals to appear by attorney, or certain persons to appear in the law courts as attorneys of parties litigant therein. Before the commission was issued to Lord Cornbury, the courts of law and equity in England, under English statutes, absolutely controlled the admission of both attorneys and solicitors.

The form of the commission or license at the present time issued by the governor of New Jersey to the legal practitioner at the commencement of his career, in terms undertakes to constitute him an attorney-at-law and a solicitor in chancery. I have not been able to ascertain when this commission or license undertook to include the office of solicitor in chancery, nor for the purposes of the present inquiry does the matter seem to be of very great importance. As we shall see, from the commencement of the administration of Lord Cornbury until the adoption of our present constitution, the office of attorney-at-law was bestowed by a governor who was also chancellor. It is safe,

I think, to assume that if the early licenses or commissions issued by the New Jersey colonial governors, undertook to vest the licensee with the office of solicitor in chancery, no such commission was ever issued until a court of chancery was created, so that the governor in exercising his discretion and issuing the commission, necessarily acted as chancellor in extending the commission, so as to make it include the office of solicitor in chancery, or at any rate consented to such extension. There seems to be ground for holding that, prior to the constitution of 1844, all solicitors in chancery were appointed by the chancellor, while no attorney of the supreme court has ever been appointed by that court.

Mr. Justice Garrison in his opinion in the *Branch Case* (at *p. 571*) accurately says: "The executive licensee is constituted a solicitor in chancery, a privilege that the supreme court of this state is confessedly powerless to confer."

The rules of the supreme court, from the earliest of which we have any knowledge, down to those now in force, have uniformly provided merely for a recommendation to the governor of applicants who have successfully passed the prescribed examinations for appointment to the office of attorney-at-law. See *Rules of 1752, 1767 and 1780 set forth in 70 N. J. Law 572 et seq.; Rules of 1805, 4 Grif. Reg. 1320*; present *rules 1 to 10.* Whatever the scope of the examinations may have been during the latter part of the historical period with which we are dealing, the rules of the court indicate distinctly that the business to be done under them relates solely to the appointment of attorneys-at-law, the officers of the court which prescribes the procedure. The governor, however, as governor and necessarily also as chancellor, originally made the additional appointment to the office of solicitor in chancery. Before any definite custom had been established, there is nothing in the history of our courts that I have discovered which suggests that the colonial governor, after he had created a court of chancery by ordinance, had not full power as chancellor (apart from the authority conferred on him as governor by his commission above mentioned, to appoint "necessary officers") to appoint and expel these officers of his court, these solicitors in

chancery, precisely as was then done by the English court of chancery.

It is interesting to note from Prof. Dwight's brief in the *Cooper Case, supra* (at *p. 78*), that the license given by the colonial governor of New York to the legal practitioner was substantially in the same form and phraseology as that employed in New Jersey at the present time, except that it undertook to appoint the party who received it an attorney-at-law only, no reference whatever being made to the cognate offices of counselor-at-law and solicitor in chancery. The structure of the courts in New York and New Jersey during the colonial period was substantially the same. The governor with or without his council constituted as much of a court of chancery as these colonies had. In each colony the court of chancery was regarded at times with great disfavor. *Field's Prov. C. 109, 110.* There were periods in New Jersey when the court of chancery was not open. *Cleve. & Keas. C. N. J. 121.*

Beyond all doubt the jurisdiction of the colonial governor of New Jersey as chancellor, either alone or in conjunction with his council, was seldom invoked during long periods prior to the revolutionary war and the establishment of the State of New Jersey. To appoint an attorney-at-law also a solicitor in chancery in large numbers of instances would probably have been an empty form. If the commissions issued by Lord Cornbury and his successors appointing attorneys-at-law were silent, like the commissions used in New York, in regard to the office of solicitor in chancery, that fact did not interfere with the power of the governor-chancellor to recognize "legal practitioners," *i. e.*, attorneys-at-law, and give them the status of solicitors in his courts. There were ordinances promulgated in the eighteenth century providing for fees of solicitors in chancery, but aside from that we find little in the colonial legislation which throws light upon the status or practice of these officers of the court of chancery.

When, following the Declaration of Independence, the State of New York in 1777 adopted its first constitution, it abolished the whole judicial system which existed in the same form in New York as in New Jersey, under which the governor with or

without his council was the chancellor and the president judge of the court of appeals—in fact the head of the judiciary of the state, it was ordained that an independent chancellor should be appointed while the governor remained as he has continued ever since, both in New York and New Jersey, the executive head of the state, clothed with political and administrative functions.

The New York constitution of 1777 therefore naturally provided that

"all attorneys, solicitors and counselors-at-law thereafter to be appointed, be appointed by the courts and licensed by the first judge of the court in which they shall respectively plead or practice, and be regulated by the rules and orders of said courts." *N. Y. Laws 1802, vol. 1 p. 14; 1 R. S. 1829 p. 35 § 27.*

From that time to the present the courts in New York, subject to the legislature, have regulated both the admission and the expulsion of attorneys, counselors and solicitors. The different kinds of law courts appointed their own officers, their own attorneys, while the chancellor appointed the solicitors. These officers were expelled or "disbarred" by the courts by which they had been appointed. For obvious reasons it was found convenient to provide by law that the removal or suspension of an attorney or solicitor "by the chancellor or the supreme court, from their respective courts" should operate as a removal or suspension in every court in the state, but in every other case the removal or suspension should be "confined to the court in which it should be declared." *1 R. S. 1829 p. 109 § 25.*

When, before the Declaration of Independence, the New Jersey constitution of 1776 was framed, it was contemplated that the separation of the colony from the mother country might not be permanent, and the convention therefore did not change the old order of things so radically as did the New York convention which was held in the following year, after the Declaration of Independence, and when the revolutionary war was in full blast. Severance of the political and judicial functions of the governor was not attempted. The governor of the State of New Jersey was left as the president judge of the court of last resort and as the court of chancery. No practical reason

therefore presented itself to the framers of this constitution for interfering with the method of appointing attorneys-at-law and solicitors in chancery, which had been established for three-quarters of a century.

Whether or not the colonial governors at any time began to include the office of solicitors in chancery in the commissions which they issued to persons who were recommended by the supreme court for appointment as attorneys-at-law, such commissions certainly began to cover both offices at some time prior to 1844. A copy of a commission or license issued in 1839 now before me is in precisely the same form as the licenses issued at the present day. It plainly was not necessary, that the colonial governors or the governors under the constitution of 1776, should license solicitors or even formally by rule of court or otherwise admit all attorneys-at-law as solicitors in chancery. These governors as chancellors might allow as of course all attorneys-at-law to practice as solicitors in their court, and thereby create and establish a custom. If, however, the colonial commissions originally mentioned only the office of attorney-at-law, as was the case in the colony of New York, there must have come a time after the business of the court of chancery had increased, either before or after the adoption of the constitution of 1776, when it would naturally have occurred to the chancellor that his custom of admitting without question as solicitors of his court the legal practitioners whom he licensed as attorneys-at-law might well have the sanction of a commission or a rule of court by which it would appear that attorneys-at-law had the permanent office of solicitor in chancery conferred upon them. The great majority, if not all of the governors of New Jersey, from the adoption of the constitution of 1776 until the adoption of the constitution of 1844, were lawyers of ability and, and long before 1844, perhaps before the adoption of the constitution of 1776, the practice which the colonial governors had followed of receiving the assurance of the justices of the supreme court in regard to the qualifications of candidates for commissions as attorneys-at-law, had hardened into a permanent custom. Apart from that custom there seems to be no reason why, before the present

constitution was adopted, the governor of the state could not license attorneys-at-law in the exercise of his discretion, without confining himself to candidates who were recommended by the supreme court, as the commissions which were issued on their face indicate may have been the case. It appears that the appointment of attorneys in New York in the colonial period was wholly discretionary, and that while the governors "usually took advice from the chief-justice of the supreme court as to whom they should appoint," nevertheless "at times" they licensed all applicants how indifferently soever recommended." *In re Cooper, supra, p. 79.*

It certainly now seems strange that when the New Jersey constitution of 1844 was framed, the able men who composed the constitutional convention of the state, embracing many eminent lawyers, did not perceive the propriety of doing precisely what the New York convention of 1777 had done. The New Jersey convention made the same change in 1844 which was made in New York in 1777. The governor was stripped of his judicial powers, and those powers were transferred to an independent chancellor, and yet the appointment of attorneys of the supreme court, mere court officers, was left vested in the governor. The theory also seems to have been accepted *sub silentio* that the governor in appointing solicitors in chancery had acted as governor without his own approval as chancellor, and therefore he might keep on appointing these officers of a court of which he was no longer the judge. The chancellor of New Jersey, since 1844, has certainly never undertaken to appoint solicitors in the exercise of an ancient power inherent in his office.

The explanation of the inaction of the New Jersey convention on the subject of attorneys and solicitors probably is that if the vesting of the appointment of these court officers in the courts, where the function naturally belongs, received any consideration, the matter was not deemed of any practical importance. The custom had become absolute that only persons found qualified by examination before the supreme court, and recommended by the supreme court for license, should be commissioned as attorneys-at-law by the governor. All arbitrary discretion of the governor in the matter, if it was ever exercised in New Jersey,

had long since been permanently abandoned. The custom also had been established for generations in England and in New Jersey of admitting as of course all duly-qualified attorneys as solicitors in chancery. The license, therefore, which no doubt originally expressed the arbitrary will of the colonial governor, had in fact become a mere form.

It is worth while to note that in the colonial admiralty court, and afterwards in the prerogative court and the orphans court, the officers who corresponded with attorneys in the law courts and solicitors in the court of chancery, were called proctors. This was the title of an ancient English office. The functions of proctors in the ecclesiastical and admiralty courts of England, and in the prerogative court of New Jersey, were different from those of the solicitors in chancery and the attorneys-at-law. After such investigation as I have been able to make I have found hardly any recognition of proctors in the prerogative court or the orphans court in statutes or rules of court prior to the constitution of 1844. See *Laws of 1777, 1st session, 3d sitting, p. 112.* The old rules of the prerogative court make no mention of proctors. *Elm. Dig. (1838) 690; Pott Prec. (1841) 27.* The older statutes allowed proctors no fees. *Pat. L. p. 418; Rev. (1821) p. 776.*

After the constitution of 1844 was adopted it seems to have occurred to the chancellor, who was also the ordinary, that the office of proctor was not mentioned in the governor's commission, as it is not to-day, and that some recognition should be made somewhere of this class of legal practitioners, these officers of the probate courts. Accordingly, in the rules of the prerogative court promulgated by Chancellor Williamson in March, 1853, we find at the very start a paragraph entitled "Of proctors" and providing that "all solicitors of the court of chancery shall be proctors of this court." Whether this rule had been promulgated prior to March, 1853, by Chancellor Halsted, I have not ascertained, but it has remained unchanged to the present time. Certainly, proctors of the prerogative and orphans court are not created by the action of the supreme court in recommending to the governor that licenses be issued to certain named individuals constituting them attorneys-at-law. I am not

aware that any official oath has ever been prescribed to be taken by persons who are made by rule of the prerogative court proctors of that court. As in the case of the court of chancery in regard to solicitors, so, also, in the prerogative court in regard to proctors, no roll has been kept. The oath which now and for a long time past has been administered to young practitioners who have received their licenses from the governor, has been made before the supreme court, and covers the office of solicitor in chancery as well as that of attorney-at-law, but makes no reference to the office of proctor in the probate courts. Of course, the place where an oath is taken is of no consequence. If, under the laws of New Jersey, a solicitor in chancery must take an official oath, I know of no reason why he should not take it before the supreme court or before any officer authorized to administer an oath, unless some statute otherwise directs.

The foregoing partial exposition of the history of the appointment of attorneys-at-law, solicitors in chancery and proctors in the prerogative court and the orphans court, no doubt is incomplete and may contain errors which a more elaborate investigation than I have been able to give to the subject would disclose and correct. I do not think, however, that any serious error can be found which will affect the proposition that the office of solicitor in chancery is essentially a distinct and separate office from that of attorney-at-law, and that under general principles apart from legislation controlling the matter, each court, the law court and the court of equity, has full power over its own officers, not perhaps to admit them except *pro hac vice,* under our anomalous system of admissions to the bar, but to govern them, to discipline them, and for just cause, to remove them.

The power of every court to discipline its attorneys or solicitors, or proctors, its subordinate officers whose work so vitally affects the administration of justice, is universally recognized. That all courts have this power in the absence of express statutory limitations is a general principle of English and American jurisprudence. *3 Am. & Eng. Encycl. L. (2d ed.) 300,* and cases cited in *note 5; Moutray v. People (1896), 162 Ill. 194.*

3. In some of the reported causes of what are commonly called "disbarment proceedings" before the supreme court, the

opinion of the court has concluded with the statement that the offending attorney would be stricken from the roll and his license vacated. I have not been able to discover any case where a rule going beyond the striking of the attorney from the roll has actually been entered. I may be mistaken, but I shall assume that in view of the history of the exercise of the prerogative of the governor to issue commissions, as above stated, the supreme court has never undertaken to vacate any commission which the governor, theoretically in the exercise of his discretion, has seen fit to issue. The rules entered in the minutes of the supreme court which I have examined, have merely stricken the name of the attorney from the rolls, the effect of which, under the old statute of Mr. Paterson hereinafter cited, is to prevent the attorney whose name is thus stricken from the roll, from ever after acting or practicing "as a counselor, solicitor or attorney-at-law" unless he be again licensed and enrolled.

The action of the supreme court in striking an attorney from its roll may, I think, be correctly regarded as a judgment that, under the condition contained in the words in his license "during his good behavior," the commission or license of the attorney has expired by its own limitation.

The supreme court, as stated above, recommends an individual strictly for a license as an attorney-at-law. The colonial governors, with full power from the time of the instructions to Lord Cornbury to appoint solicitors in chancery as well as attorneys-at-law, appear for a long time at least to have commissioned legal practitioners as attorneys-at-law only, and after 1765, also as counselors-at-law, while they undoubtedly as chancellors recognized these attorneys-at-law as solicitors whenever their appearance in the inactive court of chancery in the Province of New Jersey was called for. Until the constitution of 1844 was adopted, and the governor of the state ceased to be the chancellor, and as such to constitute the court of chancery, it was unnecessary that the commission or license to a lawyer which the governor issued should name the office of solicitor in chancery, although the propriety of such recognition long before 1844 must have been apparent.

In strict analogy with the limited recommendation of the supreme court, we find that that court upon conviction of one of its practitioners of a crime, or of "such intentional fraud upon the court or a client as shows evidence of moral turpitude" (*In re Cahill, supra*), enters a rule striking the name of the attorney from the roll of the supreme court which no doubt includes the roll of counselors as well as the roll of attorneys. What the legal consequence of this action of the supreme court upon the status of the offender as a solicitor in chancery may now be considered, although, so far as the conclusion reached in this case is concerned, it may be conceded that by force of Mr. Paterson's statute above referred to and of established custom this so-called "disbarment"—this striking of the name of a practitioner from the roll of solicitors and the roll of counselors of the supreme court has the effect of depriving the offender of his corresponding office of solicitor in chancery.

The question now before this court is not what the effect of any action of the supreme court may be, but whether the court of chancery has the power to remove its own derelict officers whatever the effect of such removal may be in other courts.

4. The statutory provision relating to the subject in hand must now be briefly considered, and the first act which calls for attention is Mr. Paterson's act to regulate the practice of courts of law passed February 14th, 1799. *Pat. L. p. 355.* The first section of this law provides that every person of full age, &c., "may appear and prosecute or defend any action in any of the courts of judicature of this state, in person or by his solicitor in chancery or attorney-at-law."

The second section provides that no person except in his own case or in the case of an infant may so appear "in any of the said courts but such as is a licensed solicitor or attorney-at-law, *who shall be under the direction of the court in which he acts.*" Thus, attorneys-at-law practice under the direction of the law courts and solicitors in chancery practice under the direction of the court of chancery.

The third section, which is the most important section for the purpose of our present inquiry, enacts that

"if any counselor, solicitor or attorney-at-law shall be guilty of malpractice in any of the said courts, he shall be put out of the roll, and never after be permitted to act or practice as a counselor, solicitor or attorney-at-law, unless he shall obtain a new license and be again enrolled in due form of law."

These sections of the old Practice act of Mr. Paterson have come down substantially without change, and now are embodied in *sections 5, 16 and 17 of the Practice act of 1903 (P. L. 1903 p. 538; 3 Comp. Stat. p. 4054)*. I do not feel called upon to construe this statute in its relation to all the matters under consideration in this case. One view certainly is that the statute is to have a distributive construction so that each court is directed to put its officers adjudged by it guilty of malpractice out of its roll, with the effect that such "disbarment" in one court would effect a similar disbarment in the other court, in accordance with the rule embodied in the old New York statute above cited. A roll, however, has no actual but only a potential existence in the court of chancery, although the maintenance of a roll which all solicitors had to sign is an ancient institution of the chancery court of England, and, so far as I can see, might at any time be established in the court of chancery of New Jersey.

Another construction of this statute confines its operation to the supreme court and to the roll or rolls of attorneys and counselors maintained in that court. Accepting this interpretation, the result is that regular disbarment proceedings in the supreme court resulting in a rule striking the name of the convicted attorney from the rolls of attorneys-at-law and counselors-at-law kept in that court, *ipso facto,* has the effect to deprive the convicted attorney of his power or privilege to practice as a solicitor in chancery until he shall obtain a new license from the governor. It would seem to be somewhat incongruous to construe this statute so as to impose the *duty* upon the supreme court of trying one of its attorneys for malpractice, not as such attorney, but strictly as a solicitor in chancery. And yet it must be borne in mind that attorneys of the supreme court, as well as solicitors in chancery and proctors in the probate courts, are not admitted until their good moral character is established and that conviction of any crime or fraud or betrayal of trust, although not connected with the functions

of an attorney-at-law, nevertheless properly renders such attorney amenable to the discipline of the supreme court, and liable to removal from his office as attorney, which removal, we are now assuming, also, *ipso facto,* effects his removal from office as a solicitor.

The point, however, which I desire to make clear is that there is nothing in this statute which undertakes to deprive the chancellor of the State of New Jersey of the inherent power which belongs to all superior courts, and which was exercised by the English court of chancery, to discipline, suspend and remove its derelict officers. It may be that the removal of a solicitor from his office, figuratively speaking, the striking of his name from the roll of solicitors, or the permanent suspension of his power to practice as a solicitor—whatever the form of the judgment or rule entered in the court of chancery may be—will have no effect upon the status of the expelled solicitor as an attorney-at-law under the provisions of this statute or otherwise. It may be necessary for the supreme court, if it desires to rid itself of an unworthy attorney, who has been expelled or suspended as a solicitor by the chancellor, and to protect the public against malpractice of which he may be guilty as such attorney, to maintain an independent proceeding against the culprit in that court. Under the rule of the prerogative court promulgated by the ordinary in 1853, above cited, there seems to be no room to doubt that the permanent suspension of a solicitor as the result of his "disbarment" by the supreme court, or by the direct action of the court of chancery, operates to suspend him in like manner as a proctor in the probate courts.

There may be several questions relating to this statute which are doubtful and are yet to be settled, but I am able to discover nothing in it which leads to the inconvenient, incongruous and absurd result that the chancellor of the State of New Jersey, the head of the judiciary of the state, must be deemed to have less control over his solicitors than the English court of chancery had, and therefore cannot rid his court of a solicitor who has been guilty of gross malpractice strictly pertaining

to his office as solicitor, but must wait until relief to the court and to the public comes from the action of another tribunal, the supreme court of the state. It may be observed that the supreme court in the case supposed has not been in the slightest degree affected by the wrongful conduct of the practitioner; the administration of justice in that law court has not been perverted by the fraud or other misconduct of the derelict solicitor.

Cases may arise where the misconduct of the solicitor relating solely to his office as solicitor may be sufficiently punished by a suspension of the guilty practitioner from his power to practice as a solicitor for a limited time, leaving him in full possession of his power during that time to practice as an attorney-at-law. Is it possible that the court of chancery is unable to impose such a sentence, and that under our system the supreme court should be called upon to undertake the investigation of such an affair and the imposition of such a punishment?

Upon general principles, aided by all the light that can be derived from the history of the appointment, and the removal of attorneys-at-law and solicitors in chancery in this country and in England, my conclusion is, that whatever the effect of this statute, which has been on our books for over a hundred years, may be, it has no effect to deprive the court of chancery of its inherent power to punish its own derelict officers by suspension or expulsion.

At the same time that Mr. Paterson drafted his Practice act, which was passed February 14th, 1799 (*Pat. L. p. 355*), he drafted his act prescribing certain oaths, which was passed February 20th, 1799 (*Pat. L. p. 376*). This statute (section 6) provides

"that every counselor, solicitor or attorney-at-law shall before he be permitted to practice in any court of this state take and subscribe in open court the following oath, to wit:

"I, ———, do solemnly promise and swear, that I will faithfully and honestly demean myself in the practice of an attorney (or of a counselor or solicitor, as the case may be), and will execute my office according to the best of my abilities and understanding. So help me, God."

This statute has come down to the present day without the change of a letter, and now may be found in *3 Comp. Stat. of N. J. p. 3769 § 6.* The important phraseology of this oath is the same as that of the solicitors' oath prescribed by an English statute, and the form of the oath and the requirement that the solicitors be enrolled are set forth in *1 Com. Dig. 618,* a work of high authority with which Mr. Paterson was entirely familiar.

With the English practice in view and this English oath in view, can there be any doubt that three separate offices were in Mr. Paterson's mind and are within the purview of this statute, and that it was contemplated that both the court of chancery and the supreme court would swear in and enroll their respective officers?

Assuming that the requirement of this statute is met if the official oaths of the two offices of attorney and solicitor are consolidated, and the oath is then taken and subscribed once for all in open court, *i. e.,* in the supreme court, the question still remains, what warrant is there for the form of the oath at present administered, which is that the licensees will honestly demean themselves "in the practice of attorney-at-law and solicitor in chancery of the State of New Jersey," and will execute, &c. I may be in error, but while I think I understand what the office is which is termed an "attorney-at-law of New Jersey," or "attorney of the supreme court of the State of New Jersey," and what the other office is which is termed a "solicitor in chancery" or a "solicitor of the court of chancery of New Jersey," I am entirely ignorant of any such office as that of an "attorney-at-law and solicitor in chancery of the State of New Jersey." Of course this oath substantially complies with the statute, and the words "of the State of New Jersey" may be considered not as a part of the title of a single office but as indicating the residence or contemplated field of activity of the officer who takes the oath.

5. Not a little of Judge Paterson's fine work in framing statutes was promptly appropriated by the legislature of New York, and it appears that two years after Mr. Paterson's statutes, his Practice act and his act prescribing certain oaths, had been enacted in New Jersey, portions of these statutes were

adopted and enacted in the same or similar phraseology in New York in the "act concerning counselors, attorneys and solicitors," passed March 20th, 1801. *Laws of New York revised 1801, vol. 5 pp. 49 and 50; Laws of New York revised 1813, vol. 1 p. 219.* The fourth section of this statute expressly provides what in my judgment is implied in Mr. Paterson's act (although the matter perhaps is not of much consequence), that attorneys and solicitors "shall be put in a roll or book to be kept in each court for that purpose," and then proceeds immediately to adopt and prescribe the oath in the same words employed in Mr. Paterson's law and taken by him, as we have seen, from the English solicitor's oath, and probably the English attorney's oath as well. The next section (section 5) provides for the suspension or putting out of the roll of counselors, attorneys and solicitors for malpractice, &c., after which immediately follows the provision that if one of these officers is "put out of the roll" he "shall never afterwards be received to act as counselor, attorney or solicitor in any court." Thus we find that Mr. Paterson's laws were framed upon the English model, which presented legal practitioners as holding two distinct offices in two courts where they were separately enrolled and separately sworn into office, and were then promptly adopted by the State of New York where the English system prevailed, and into which system these laws in phraseology to the same effect as that employed by Judge Paterson fitted with accuracy.

Although some repetition may be caused in this already too lengthy discussion, it may be useful in determining whether an attorney-at-law and a solicitor in chancery are, in New Jersey, two separate officers of separate courts, each removable by his own court, to consider together the phraseology and grammatical meaning of these two laws framed by Mr. Paterson in 1799, one of which relates to the induction of attorneys-at-law and solicitors in chancery into office, and the other to their expulsion.

As to the statute prescribing an official oath for legal practitioners, I am unable to perceive any room for argument. The "case of a solicitor and the case of a counselor, and the case of an attorney are three separate cases" in which different official

oaths are to be employed. There is no provision for a single oath to be taken once by an officer who is termed an attorney-at-law and solicitor in chancery. The oath refers to the "practice of an attorney" and the "practice of a counselor," and the "practice of a solicitor" as three separate things. The use of the parenthesis is significant because it is usually employed where a statute is dealing with two or more separate things to which the act not jointly but separately and distributively is applicable.

In regard to the provision of Mr. Paterson's Practice act, in relation to the effect of the expulsion of an attorney-at-law upon the status of the expelled attorney as a solicitor in chancery, it seems quite plain that if there were only one office which a lawyer held as an "attorney-at-law and solicitor in chancery," this provision would be without its manifest and most important force or effect. This law is evidently based upon the theory that a lawyer may hold two offices, one as an attorney in a law court and another as a solicitor in the court of chancery, and that therefore he might be disbarred for malpractice by one court while he would remain holding his office in the other court, until the other court had in like manner disbarred him. I strongly incline to the opinion that Mr. Paterson, when he framed his Practice act, and the legislature when it adopted it, either erroneously supposed that the court of chancery maintained a separate roll of its solicitors, and that they took their official oath as solicitors before the chancellor in open court, or they assumed that this practice—the English practice—would be established forthwith in New Jersey. As we have seen, when Mr. Paterson's act was adopted in New York in 1801, the matter was made clear by an express provision. If, however, the correct theory is that the intention of this statute in 1799 was to deal solely with the disbarment of attorneys in the supreme court, where they were enrolled, the argument still remains the same that Judge Paterson and the New Jersey legislature recognized the fact that such disbarment in the supreme court depriving the lawyer of his office of an attorney-at-law, would have no effect upon his status as a solicitor in chancery under the system of attorneys and solicitors which then prevailed in England, and

up to the time of the passage of this new statute had prevailed in New Jersey. In brief, it was because the attorney and solicitor were distinct officers, and that expulsion from one office had no effect upon the other office, that this new statutory rule was laid down and very soon after was appropriated by the State of New York. Of course, if Judge Paterson's law had provided that the lawyer who was "put out of the roll" should never after be permitted to act or practice "as a counselor or attorney *and* solicitor," the unity of the two offices would have been indicated and the law would not have fitted into the New York system. But the words are "counselor, solicitor *or* attorney-at-law."

6. In considering the question whether the court of chancery is impotent to suspend and expel its own officers for malpractice, it may be noted that neither the statute above cited—Mr. Paterson's Practice act—nor any custom provides any proceeding by which a case of malpractice by a solicitor within the knowledge of the court of chancery can be officially communicated to the supreme court for investigation and appropriate action. If the court of chancery cannot attend to this important business directly relating to its own administration of justice, it must await the voluntary action of another court for relief which often should promptly and summarily be obtained. A solicitor convicted by a final decree of the court of chancery for a gross fraud upon his client might therefore continue practicing openly as a solicitor for a long period before, by the voluntary action of the supreme court, the court of chancery could be relieved of its scandalous burden.

7. It is important to observe that the supreme court derives no power from any statute to suspend attorneys-at-law for malpractice, or to punish attorneys in any other way than by expulsion. The mandate of the statute is that if an attorney be guilty of malpractice he shall be put out of the roll and never after be permitted to practice as a counselor, solicitor or attorney-at-law, unless he obtain a new license and be again enrolled. No provision is made for the imposition of a less punishment than expulsion, and yet the power of the supreme court to punish malpractice by suspension has frequently been exercised without question. Nothing expressed or implied in this statute can in-

terfere with the power of the court of chancery to punish derelict solicitors by suspension. The words of this statute, its origin in 1799, in the mind of that very learned jurist and framer of statutes, Judge William Paterson, and its adoption and enactment in the State of New York, where it was applied to a judicial system, in which the offices of attorney-at-law and solicitor in chancery were absolutely distinct in respect of both appointments to and removals from these offices, indicate, I think, distinctly that the first provision of the law was declaratory and that the main object of the law was to provide for the effect of the expulsion of an attorney for malpractice upon his office as solicitor in chancery, and the effect of the expulsion of a solicitor in chancery upon his office as attorney-at-law.

In my judgment, the plain truth is that the supreme court has always exercised an inherent power in disciplining its officers, and the above quoted provision of the Practice act has never been accepted as limiting that power.

8. I am not informed whether or not in so-called disbarment proceedings before the supreme court, a rule has ever been entered affecting the office which the convicted attorney may have held as a supreme court commissioner. I have never heard that any rule has ever been entered expressly purporting to destroy the convicted attorney's status as a solicitor in chancery. Presumably, it has been thought that Mr. Paterson's law above cited covered the case and extended the force of the rule striking the attorney from the roll so as to deprive him also of his office of solicitor in chancery. But in regard to the independent office of master in chancery, can it be seriously claimed that a rule of the supreme court striking an attorney from the roll, under Mr. Paterson's law, or otherwise, can be deemed to operate so as to vacate the office of master in chancery which the convicted attorney may happen to hold under appointment of the chancellor? The same question may be asked in regard to the examiners in chancery. In the recent case of *Bedle, 87 Atl. Rep. 100,* where the rule entered by the supreme court merely purported to strike the convicted attorney's name from the roll, it was deemed advisable to prosecute an independent proceeding in the court of chancery which resulted in an order purporting to expel Mr.

Bedle from his office as solicitor, and also to remove him from his office of master. That the office of master is a thing entirely apart from that of a solicitor in chancery and may be dealt with separately, is illustrated by the case *In re H. C., Jr., 81 N. J. Eq. 8.* The respondent in that matter was both a solicitor and a master, yet the proposition to discipline him was only in regard to his office as master, although it might well have extended to both offices.

Under one construction of Mr. Paterson's law above set forth, the rule entered in the supreme court *ipso facto* may have effected the expulsion of Mr. Bedle from the office of solicitor in chancery, so that the order of the court of chancery to that effect was unnecessary, but I am unable to perceive any possible theory upon which such rule could operate to expel him from his office as master in chancery. There is no necessary connection between the office of solicitor in chancery and the office of master in chancery, and the chancellors of this state have occasionally appointed as masters men who were not licensed as attorneys or solicitors. It would be a very singular state of affairs if the chancellor, admittedly clothed with full power to appoint and remove masters of his court, is powerless to remove or perpetually suspend a solicitor who has been guilty of malpractice in his court.

9. Some of the reported cases which recognize the inherent power of every court to expel its attorneys or solicitors for malpractice, refer to the fact that the power of removal flows from, or is connected with, the power of appointment. In our anomalous system of admissions here in New Jersey, as we have seen, attorneys-at-law and solicitors in chancery from the start have been appointed by the governor. The view has been indicated above that this power was first vested in the colonial governor by the commission of Lord Cornbury, and then became an established custom. The appointment of attorneys-at-law therefore may be connected with the ancient practice according to which attorneys were forced upon the law courts by letters patent from the king, although this practice had ceased long before the settlement of the colony of New Jersey began. The governor-chancellor was a law judge (disassociated from

equity) only as the president of the court of appeals. The law courts where the attorneys had the most of their practice were held by judges who were independent of the governor, although appointed by him. And yet the supreme court exercises the power of disciplining its officers, these attorneys-at-law, by expulsion and suspension. In New Jersey, therefore, the power to expel and suspend is not connected with the power to appoint.

In England, as we have seen, the solicitors were actually appointed and commissioned by the judge of the court where they practiced, and these officers were never foisted upon the English court of chancery by letters patent from the king. Whether to-day the supreme court of New Jersey and the court of chancery of New Jersey, or either of these courts, have any inherent power to appoint their officers—these attorneys and solicitors respectively—I do not now suggest. We are dealing solely with the power of removal and suspension which the governor, the appointive power, has never exercised, so far as I am aware—certainly not since New Jersey became a state.

10. It may be said that the inherent power of removal which the court of chancery of New Jersey might have possessed if it had been earlier asserted, has been lost by disuse. I do not think that there is any force in this suggestion. The business of the court of chancery has increased enormously during the last generation. There was little reason until a comparatively recent time for the exercise of jurisdiction by the chancellor to punish solicitors for malpractice, because the remedy by disbarment proceedings in the supreme court was deemed practically adequate for all the cases which arose. Malpractice as a solicitor, fraud upon a client or court of any kind, constituted a ground upon which the supreme court could strike an attorney and counselor-at-law from the rolls of the supreme court, and then no doubt it was considered that Mr. Paterson's statute disbarred the derelict lawyer in all the courts, including the court of chancery. There was no occasion, therefore, until a very recent time, for the exercise of the inherent power of the chancellor to discipline his own solicitors, and until very

recent times there seems to be hardly any trace of a case of gross malpractice strictly in the office of a solicitor in chancery.

An inherent power of one of our courts is not lost by mere disuse, during a period however long, in which there was practically no occasion for its exercise. With the enormous increase of business in the court of chancery during the present generation, the amount of work done by lawyers as solicitors, as compared with the amount of work done by lawyers as attorneys-at-law, has greatly increased. The development of divorce business also has multiplied the temptations of unscrupulous members of the profession to attempt frauds upon our laws and upon the court of chancery. While forty years ago, as our law reports show, cases of malpractice by attorneys-at-law were far more common than cases of malpractice by solicitors, I incline to think that at the present day the reverse is true. In New Jersey as in other states there has of late been a great increase of vigilance on the part of courts and bar associations, directed toward the protection of the courts and the public from frauds and other breaches of trust committed by men who hold commissions as attorneys and solicitors. It seems to me that the fact that, so far as our reports show, the chancellors of fifty and seventy-five years ago found no occasion to exercise the inherent power of disciplining the solicitors of the courts, if such was the case, constitutes no argument in favor of the proposition that at the present day, under the present conditions, the chancellor of the state should not exercise this ancient, inherent power.

In concluding this branch of our inquiry it is well to make emphatic the narrow point which we are endeavoring to establish. The question is not as to the power of the supreme court to expel an attorney-at-law from his office or strike his name from the roll on the ground of fraud perpetrated strictly as a solicitor in chancery. The question is not as to the effect, under Mr. Paterson's statute or otherwise, of such expulsion upon the other office which the convicted attorney may hold as a solicitor in chancery. The question is not as to the effect, if any there be, of the expulsion of a solicitor from his office or his perpetual suspension by the chancellor upon the other office

as attorney-at-law which the solicitor may hold. The sole question is whether the chancellor has the power, which the English court of chancery had, to expel a solicitor from his office for gross malpractice strictly in that office, whatever the effect of such expulsion may be in the courts of law.

11. It now remains in the last place to refer to any precedents which affect the disposition of this case because they are binding upon this court.

The language employed in some of the reported cases of disbarment proceedings in the supreme court, especially the older ones, must be read with the fact in view that little attention was paid to many of the most vital questions relating to the appointment of attorneys-at-law until the *Branch Case* was presented to the supreme court for consideration and decision, and that no attention whatever at any time seems to have been paid to the most important questions relating to the expulsion of these court officers, attorneys, solicitors, proctors and counselors. What our supreme court was doing in most of the cases was very practical business, in which it was not necessary to give very much consideration to history or theory.

*In re Edmunds* (not reported). This was a case of forgery of a divorce decree presented to Chancellor Runyon over thirty years ago. The malpractice was that of a solicitor in chancery strictly, and not that of an attorney-at-law, although the supreme court no doubt, if the matter had been brought to its attention, might have seen fit to disbar or strike from the roll an attorney, who, as a solicitor, had committed such a fraud and crime. Chancellor Runyon did not hesitate to exercise jurisdiction in the case, and he adjudged that the convicted solicitor should be expelled from his office, although subsequently, upon certain representations that were made to him, he was induced to show mercy and stay the infliction of the penalty. This case is directly in point and I cannot see how it can be disregarded as a precedent.

*In re Simpson, 21 N. J. L. J. 109.* In this case Judge Hudspeth, an experienced and courageous magistrate, presiding over the criminal courts of Hudson county, exercised the inherent power of the Hudson quarter sessions to control its officers, and

suspended two attorneys pending their indictment. They were acquitted and the suspension was then vacated.

This case illustrates the absolute necessity of clothing every court, under whose "direction" its officers, whether counselors, attorneys, solicitors or proctors, perform their functions in the administration of justice, with absolute control over them, and with full power to suspend or even expel them. Is it possible that if an attorney practicing in one of our criminal courts is convicted upon an indictment for bribery of jurors, the court is unable to suspend or remove him, but must tolerate his practicing daily before its bar, until his conviction of felony has been affirmed by the higher courts or disbarment proceedings have been prosecuted to a finish in the supreme court?

*In re Cahill, 66 N. J. Law 527.* In this case the sole charge against the defendant was of fraud and imposition practiced upon the court of chancery in a divorce suit. The distinguished chancellor, before whom the divorce suit was pending, and who discovered the evidence of fraud, thinking no doubt that the whole matter could be conveniently disposed of by the supreme court, had the evidence communicated to that court and thereupon proceedings were had in the supreme court which culminated in an order suspending the defendant as an attorney of the supreme court for a period specified, and ending in a mandate or injunctive order that, until the period specified had expired, the defendant be "prohibited from practicing as an attorney or solicitor in any of the courts of this state upon pain of being stricken from the roll absolutely" if he should violate the order. There is no question about the jurisdiction of the supreme court to conduct this proceeding and make this order, incongruous as the exercise of such jurisdiction in the particular case may now seem. The supreme court, for its own protection, of course, has ample power to suspend attorneys who are proved to have committed such a gross offence as was proved against the defendant in that case. Chancellor Magie subsequently regretted that he had referred this case to the supreme court, and announced his determination that if another case arose of misfeasance or malpractice, committed by a practitioner strictly and exclusively in relation to his office as solicitor in chancery, and

having no connection with the office of attorney-at-law, he would not burden the supreme court with the investigation of the matter in the first instance, but would try the case himself, and if the offence should be proved, discipline the officer of his own court in the manner and to the extent which he deemed fitting.

12. If all the opinions and surmises in regard to the nature and status of a solicitor of the court of chancery of New Jersey hereinbefore set forth should be deemed erroneous—if it may be supposed that there is a single office in New Jersey which combines the functions of the English attorney-at-law and the English solicitor in chancery, as I understand is the case in what are called the code states, where not law and equity but the administration of law and equity has been more or less consolidated, it still remains true to-day that every lawyer, let his official status and title be what they may, when he practices as a solicitor in the court of chancery, is "under the direction" of that court. Nothing but plain provisions of the constitution or of constitutional legislation, if there could be such on this subject, should be construed to deprive the chancellor of the state of the great and wholesome, even necessary, power anciently beyond all doubt vested in his office to discipline lawyers who are guilty of malpractice as solicitors of his court, by indefinitely prohibiting them from further practice as such solicitors, or by imposing such briefer term of disqualification as he may deem appropriate and necessary for the administration of justice in his court. No matter what solicitors are or how they are appointed, or how they are stricken from the roll or permanently deprived of the office or offices which they hold under commission from the governor, the court of chancery, unless it is to be considered inferior to hundreds of petty law courts all over the country, must exercise disciplinary power over its officers according to its own discretion, and cannot be deemed dependent upon any other court for the discharge of this important function relating to its own machinery and its own internal affairs.

13. Since the foregoing opinion was written, I have been enabled by the kindness of a number of gentlemen to inspect or become acquainted with the contents of several commissions or "licenses" issued to "legal practitioners" by the colonial governors and the

governors of the state under the constitution of 1776, and also to obtain considerable light upon some of the subjects under investigation from the records and files of the supreme court. This new information illustrates the views and inferences hereinbefore set forth, without, so far as I can now recall, making any qualification of those views and inferences necessary.

A commission bearing date November 18th, 1717, was issued by Governor Hunter appointing one John Read as examiner of the "court of chancery" in the "Province of New Jersey in America." This commission runs in the name of the king but is attested under the seal of the Province of New Jersey by Robert Hunter, Esquire, who is styled "Our Capt. General and Governor in Chief of our Provinces of New Jersey, New York and Territories thereon depending in America and Vice Admiral of the same," &c.

The report has come down that Governor Hunter held a court of chancery in New Jersey and in New York in 1718 (*Field's Prov. C. 112; Clev. & Keas. C. 121*), and presumably the appointment of John Reed as an examiner was made in order to meet the requirements of the business of that court. And yet Governor Hunter, who was the chancellor, with all the powers in New Jersey of the lord-chancellor in England, saw fit to issue this commission in the name of the king in pursuance of the powers conferred upon him and originally upon Lord Cornbury by the king's commission. Possibly, a fee paid for the commission determined the form of the appointment. It is also worth while perhaps to note that the commission does not recite that Governor Hunter was the chancellor of the state while it does recite that he was vice-admiral.

A commission bearing date May 10th, 1763, was issued by Colonial Governor Franklin appointing one Jasper Smith "an attorney-at-law," authorizing him to appear and practice "as an attorney-at-law in all his Majesties court of record within the Provinces of New Jersey * * * for and during his good behavior." This commission was issued in the name of "William Franklin, Esquire, Captain General and Governor in Chief in and over his Majesties Province" of New Jersey, &c. "Chancellor and Vice-Admiral of the same &c." This commission is

under the "Seal at Arms" of the governor—the governor's private seal and not the seal of the Province of New Jersey.

The commission issued by Governor Livingston in 1784 appointing Mr. Richard Stockton an attorney-at-law, is substantially in the same form as the one above described, issued by Governor Franklin in 1763, excepting that the enumeration of the governor's titles concludes with the words, "Chancellor and Ordinary." This commission to Mr. Stockton is also "under the hand and seal at arms" of Governor Livingston.

A similar commission was issued by Governor Livingston in 1787 appointing Mr. Richard Stockton "a counselor-at-law and also an advocate and solicitor," and authorizing him to receive such fees as may be established for services "as counselor, advocate *or* solicitor." This commission also recites that the governor is "chancellor and ordinary" and is given under the governor's "hand and seal at arms."

The most important matter exhibited by these commissions to Mr. Stockton consists in the proof they afford that at this early period in the history of the courts of the State of New Jersey, the office of attorney-at-law was entirely distinct from that of solicitor in chancery. Governor and Chancellor Livingston evidently did not think that the commission which he issued to Mr. Stockton appointing him as attorney-at-law, bestowed upon him the other office of solicitor in chancery. It may be surmised, however, that if Mr. Stockton, between 1784 and 1787, had assumed to practice as a solicitor before Chancellor Livingston, he would have been permitted to do so.

The commission issued in 1839, hereinbefore referred to, was issued by Governor William Pennington to Joseph P. Bradley. It is under the hand of the governor and "the great seal of the State of New Jersey" and appoints Mr. Bradley "an attorney-at-law and solicitor in chancery," and authorizes him to receive fees "for any service or services which he shall or may do as an attorney-at-law *and* solicitor in chancery in the said state." This form of license, I understand, has continued in use until the present day. It would seem that the word "and" italicized in the above quotation, should be taken as "or." This form of license, together with the form of oath appearing at the top of

the roll of attorneys in the supreme court for the first time in 1843, hereinafter described, indicates that at a comparatively recent date, but before the governor of the state had ceased to be the chancellor, the notion, perhaps somewhat hazy, that there was a single office entitled "attorney-at-law and solicitor in chancery," began to prevail at least to some extent in New Jersey.

In regard to the form of oath taken by attorneys at different periods, some interesting information has been obtained by an examination of the rolls and records of the supreme court. Down to about the year 1802 all entries on the minutes refer to "attorneys-at-law" only, but after that date the minutes generally refer to "attorneys-at-law and solicitors in chancery."

In the minutes of the November term, 1802 (at *p. 486*), it is stated that Charles Ewing having presented his license "to appear as attorney, proctor and solicitor at law and at equity, took the usual oaths, signed the roll of attorneys and was admitted accordingly." Whether in fact the commission issued to Mr. Ewing appointed him a proctor I do not know. As advised at present I am inclined to regard this entry in the minutes, which certainly is clumsy and inaccurate in form as erroneous so far as it refers to the office of proctor, although it may be that in this instance and in others the governor, who was also the ordinary and judge of the prerogative court, saw fit to appoint the legal practitioners, whom he licensed as attorneys and solicitors, as proctors in the other court which he held. If such a practice at any time obtained, or in any special instance or instances was followed, it seems to have fallen into disuse before the constitution of 1844 was adopted.

In the minutes of 1804 (at *p. 10*), it appears that three licenses were produced in court authorizing the licensees "to practice as an attorney-at-law and solicitor in equity," and thereupon it is recorded that these licensees "took the usual and necessary oath prescribed by law, signed the roll, and were admitted accordingly."

Prior to 1843 the rolls of attorneys which have been discovered show that the licensees of the governor made oath in the form prescribed by Mr. Paterson's law, faithfully, honestly

to demean themselves in the practice of an attorney-at-law or a counselor-at-law, no reference being made to the office of solicitor in chancery.

In 1843, however, the oath at the top of the roll of attorneys was changed by substituting the form at present employed, according to which the licensee of the governor made oath that he would faithfully, &c., demean himself "in the practice of an attorney-at-law and solicitor in chancery of New Jersey."

Any argument based upon the form of words employed in these old commissions and these old court records, in my judgment would have very little force. These documents show that during the long period which they cover, more or less vague ideas were entertained and anomalous practices followed in regard to the induction of legal practitioners into the offices of attorney, solicitor and proctor. The fact that every lawyer from the start held all three of these offices made the phraseology used in referring to them largely a matter of form, and also led to indefiniteness of thought and inaccuracy of expression.

14. An order will be advised debarring the respondent from appearing in this court as a solicitor, and prohibiting him from exercising any of the functions, rights or privileges of a solicitor of this court.